We'll now hear 23-5114, U.S. v. Jacobo, is that pronounced right, Mr. Villa? Thank you Judge Hartson. Good morning and may it please the Court. I'm Ryan Villa. I represent the appellant, Luis Jacobo. So, we are challenging two aspects, generally, of the District Court's decision. First, the sufficiency of evidence on the continuing criminal enterprise charge under the Controlled Substances Act. Second, the imposition of multiple sentences, which would become at issue if the Court does not find the evidence insufficient for continuing criminal enterprise and affirms then the sentences for both continuing criminal enterprise and the other underlying offenses, which were drug conspiracies and what I refer to as phone counts, use of a communication facility, would then be improper to sentence Mr. Jacobo to both. With respect to the continuing criminal enterprise, we challenge only the fourth element, which is that Mr. Jacobo must have organized, supervised, or controlled five or more persons in these drug offenses. And for that, the government must prove that he exercised some form of managerial authority over these individuals. So we start from the premise that this Court has made clear, a proof of a buyer-seller relationship is not sufficient. It must be more than that. So simply arranging for a sale with a buyer, discussing a price, discussing a method of payment, and executing that buyer-seller relationship doesn't get there. And what the United States referred to often in the lower court and somewhat on appeal is that, in their view, Mr. Jacobo was sort of like a CEO or high-level manager of, say, McDonald's. And it's our contention that he's more like the meat supplier for the McDonald's. The United States argues that there were essentially three drug trafficking organizations, DTOs, represented by three individuals, two of whom testified at trial, and that's Samantha Grace or Samantha Handy, who changed her name after the offense and before trial, Mitzi Jones, and William Johnson, or Billy Johnson. And the evidence is not disputed by Mr. Jacobo that he supplied these individuals, not all the time, but frequently, within the scope of the conspiracy in this case, conspiracies with methamphetamine, from Bakersfield, California, to Oklahoma, where these individuals were located. And those three individuals had, below them, sub-distributors, or street-level dealers. So each of them would receive bulk quantities of methamphetamine and provide it to their dealers to be dealt onto the streets. And of course, there was a myriad of evidence about what these individuals did, how they ran their drug trafficking organizations and received methamphetamine from Mr. Jacobo in support of counts two through four, which were the three separate drug conspiracies represented by these individuals. Counsel, can I ask you a question about Ms. Handy and Ms. Jones? My understanding from the record is that they previously lived in Bakersfield, where your client also resided, but at some point moved to Oklahoma. Was there any evidence in the record to support that Mr. Jacobo directed them to move to Oklahoma for purposes of methamphetamine distribution? No. In fact, I believe it was Ms. Grace who testified that she moved to Oklahoma to live with the father of her child, because he was there, her child was there, and he allowed her to live there. I don't think there was any evidence in the record why Ms. Jones ultimately relocated to Oklahoma, but I think that what the evidence demonstrated is that Mr. Jacobo and Ms. Grace had a relationship before she left Bakersfield to provide drugs to Ms. Grace, and that Ms. Grace, when she got to Oklahoma, reached out to Mr. Jacobo to supply her with methamphetamine. And so that sort of speaks to the lack of evidence about managerial or supervising authority over Ms. Grace. It was really an arm's-length relationship that the two of them had. Sure, there were some disputes about payments, and there was the way Ms. Jones came to be in her own DTO, if you will, as she originally worked for Ms. Grace as one of her sub-distributors, and then essentially went around Ms. Grace and contacted Mr. Jacobo directly to say, hey, supply me. And that led to a dispute between the two that Mr. Jacobo did provide some advice to Ms. Grace about to try to resolve this dispute. But that, from viewing the evidence, of course, in the light most favorable to the government, didn't rise to the level of some sort of order or direction. Just, hey, work out your differences. Imagine a meat supplier selling to two separate McDonald's, and the two managers of those McDonald's get into a fight with each other. The supplier is just trying to broker some sort of peace agreement between the two. Yeah, but why can't we affirm, when looking at the evidence in a light most favorable to the government, just based upon the fact that this wasn't a street-level, hand-to-hand type relationship. I mean, he is directing the supply from the west coast to the middle of the country. There was extensive communications electronically, not just about the supply coming west to east, but who could be involved in the network, and who could deal with him directly, and where the money should go, and who he could pick up from. I mean, this sounds a lot like a hierarchical organization that had some complexity to it. And that tends to be exactly what this statute is intended to cover, right? It does cover that. I think we disagree that the particular relationships Mr. Jacobo had with these three drug trafficking organizations were that way. He certainly had his own organization, and the folks under his command, and we've agreed there's Mr. Garcia, Mr. Martinez, and Ms. Haynes, who were essentially folks that he recruited, that he used as runners, he used to help facilitate these drug transactions. But I think we have to draw a line between what communications, what things will take place to set up a buyer-seller relationship versus someone who has authority. And the cases, which I found interesting, most of these cases are from the 90s. There's not a lot of 10th Circuit cases between 2000 and now, but they're very helpful in that they talk about much more control and managerial authority over the people that those individuals were supplying. So controlling the price. This is how much you must sell it for, versus this is how much I'm going to sell it to you for, which I think that's fair game in a buyer-seller relationship and doesn't rise to the level of what's required for the fourth element, just I'm going to sell you this meth for this much money. But it was clear from both Ms. Grace and Ms. Jones' testimony at trial that he didn't tell them to whom they could sell. He didn't tell them how much to sell it for, how to do it, or anything like that. They had discretion. The discussions about who could be involved and those sorts of things were more of encouraging them to reach out to more people to distribute. So sort of providing them advice, if you will. So I think there was testimony with Ms. Grace that a couple of her family members, both who went by Grace, that Mr. Hercogo encouraged her to use them in her sort of trafficking network, but wasn't ordering her to do that or wasn't limiting her ability. I don't use this person, but it's okay to use that. It was more advice and encouragement. And so I think that's the way it went for all three of these traffickers. Now Mr. Johnson didn't testify, so the testimony came from a lot of other individuals who were sort of the sub-dealers for Mr. Johnson, many of whom, in fact most of whom, did not have direct knowledge about his relationship with Mr. Hercogo. I think only one of them actually met Mr. Hercogo doing a run in Las Vegas. There was one run in Las Vegas and one in Albuquerque where it was clear that that person was a runner for Mr. Johnson. So certainly Mr. Johnson directed and controlled that individual, and that individual met with Mr. Hercogo on one occasion and Mr. Garcia, who was Mr. Hercogo's sort of right-hand man, on another occasion, but there was no indication of any sort of control over Mr. Johnson. I mean, sure, runners, I think, are evidence of management, and I'll talk about the runners for Mr. Hercogo in a minute, but these runners who Mr. Johnson said to meet with Mr. Hercogo or Mr. Garcia, Mr. Hercogo's assistant, if you will, never said anything to the jury that could be interpreted as Mr. Hercogo was controlling them or directing them or managing them. I think there was one occasion where it was Mr. Rast who, I guess along the way, his car got damaged and Mr. Hercogo replaced it. Now, with more evidence, perhaps that might indicate some sort of control, but it also might just be a nice gesture that he fixed his car, but there was certainly no testimony about his interactions with Mr. Hercogo that Mr. Hercogo ordered him to do anything or directed him to do anything. Those are the things you saw with Mr. Martinez and Ms. Haynes, who we can see that he had managerial authority over there. He was really telling them what to do and where to go and what to be. What you're saying is there's this relationship that there's evidence about and you would not characterize it as a boss-subordinate relationship, but the question is whether it would be unreasonable for a juror to characterize it otherwise. That's the hump you've got to get over, isn't it? I agree. You think with the evidence that you've recited, that would be unreasonable for the jury to find, other than the three conceded people who were subordinate to Jacobo. I do. I think with respect to the individuals who testified, which was either Ms. Jones or Ms. Grace or their sub-distributors or Mr. Johnson's sub-distributors, that yes, it's not enough. When they referred to him as boss or our team, that doesn't support an inference that that's the relationship, that they're part of one team and he's in charge of it? It does, but in light of the other evidence, in this particular case, it's not sufficient. The boss comment was more colloquial as opposed to, you're my boss, and there wasn't really evidence in support of he was actually the boss, especially with the testimony about he didn't tell me who to sell to, didn't control the prices, when he ran out of meth, I went to other people, there was no sort of direction in that way. Now with the runners, I think it's a closer case, because there was clearly testimony about runners. The problem here is that, was the evidence sufficient that it wasn't Mr. Martinez, Mr. Garcia, or somebody else? Because what you had was testimony about, well, somebody drove a truck, and that person was Hispanic, well, Mr. Martinez was Hispanic, Mr. Garcia was Hispanic. There wasn't more description of the people, I thought someone was short, someone was, does that fit, did those descriptions always fit the other men? Well, it wasn't clear, I think one of the descriptions was similar to Mr. Martinez, or excuse me, Mr. Garcia, it was unclear what Mr. Martinez' dimensions were, so the heavyset individual, there was no testimony, was Mr. Martinez a heavyset individual, could it have been him, or someone else? And it wasn't clear testimony that more than one truck driver who was Mexican didn't meet the description of these two people, it was very short, sort of offhand. Counsel, can I ask you about the double jeopardy claim? Yes. Why doesn't Garrett defeat your argument that the phone counts as predicate offenses for the CCE constitute double jeopardy? I mean, it seems to draw the line between conspiracy and substantive counts in Garrett, so setting aside the conspiracies, but just pointing out to the phone counts, why doesn't that case dictate the outcome here? I think the difference is here, the phone counts were specifically alleged as predicates for the continuing criminal enterprise in the special verdict form, which we cite to the record proper. The jury was asked, do you find the first of the three drug conspiracies, and then do you find the phone counts, and they found essentially all but a couple of them. And that was under the guise of meeting the element of the continuing criminal enterprise, that there be at least three or more. So had the jury hypothetically acquitted of all but only three phone counts, that would have been sufficient to meet the continuing criminal enterprise element, but not for separate offenses. And I see that I'm out of time if there aren't any more questions. Doesn't the phone count require proof of a separate element? And if so, then how does the argument stand? It does require proof of a separate element, as I think, I mean the conspiracies may be a little less so, but the problem here is it's the other way around. The continuing criminal enterprise requires three separate drug felonies, and they can be phone counts. And in this case, they were, and that's how they were presented to the jury, as elements of count one, the CCE. They were then presented as separate crimes themselves, but because the government made them part of that element of CCE, that there's at least three drug felonies, in this case they became an element of the continuing criminal enterprise offense. Thank you, counsel.  Mr. Duncombe? May it please the court, Thomas Duncombe for the United States. Viewing the evidence in the light most favorable to the government, a rational jury could have found that Mr. Jacobo's actions were sufficient to show that he managed, supervised, or organized, or some combination of those terms, at least five individuals. The terms, supervise, manage, and organize, are flexible. The case law is clear that those terms are given their ordinary, everyday, non-technical meanings, and the case law is clear that there's no formal hierarchy required, no formal orders required, and this case fits neatly into fact patterns like Jenkins or Apodaca, where there were informal indications that Mr. Jacobo was the central figure in running this business and that he gave direction to, gave orders to at times, organized the activities of the people below him, including subordinates of the people below him. If this court, in addition to the three people that Mr. Jacobo concedes he directed, managed, organized, or supervised, if this court simply finds that Mr. Jacobo, that the evidence was sufficient as to Samantha Handy or Samantha Grace and one additional runner like Tony Garcia in California, then this case is over and the court should affirm. The part of the reason why the government outlined all the, we think at least a dozen other people that Mr. Jacobo managed, supervised, or organized in the course of his enterprises, there is no one way to look at the facts, there is no one way to look at the organization of this particular group. So one juror's organization might have been another juror's independent contractor, but there certainly were numerous candidates within the record that the jury could have selected and they didn't all have to be unanimous as to the five people and they didn't have to know the names of the five people. Well, let's let you go through something like Ms. Grace, Ms. Handy. Absolutely. So as to Ms. Handy, there's, she probably had the most text messages that we were able to present at trial and the government would submit the only real difference between her and Mr. Johnson is we didn't have Mr. Johnson talking to the jury about what his business was, but there was evidence through Ms. Handy that Mr. Jacobo set prices, not all the time, but at least occasionally. Set prices that she could charge? Set prices, and the evidence was not clear as to whether it was prices that she could charge or whether it was prices that he was charging to another distributor that Ms. Handy had recruited, but Mr. Jacobo's language in the texts to Ms. Handy about someone else that she had recruited on his behalf was if he wants to do three boxes a week, it's going to be at your price. So that was his edict and whether that was it's going to be the price that you're paying me or whether it was it's going to be the price that we have established that you are going to charge people, there was some exercise of control over pricing and that's what the district court found. But even if this court disagrees and finds that there was absolutely no control over resale pricing, the fact that he was the one setting the prices for Ms. Handy and Ms. Jones and by extension the other sub-distributors, the jury could have inferred that the business worked the same basic way. When you say setting the prices for the other distributors, you mean the prices at which those distributors charge their customers? The jury could have found that based on that text message, but the jury didn't have to find that and the jury does not have to find that the CCE defendant set resale prices in order to find that he organized, managed, or supervised. Okay, but that was some evidence you gave that he did manage, the defendant did manage them. Yes. What else do you have? Well, there was with regard to money, there was Mr. Jacobo issuing threats like the defendant did in Jenkins. When the money wasn't forthcoming, Ms. Handy said, I'm not going to pay because I'm upset with how you've treated me versus this other distributor. Mr. Jacobo sent some very sharply worded text messages saying, thinking you're going- Why is that so different from any customer? Why couldn't he do that with the customer? Well, Jenkins uses that as one factor among many, just as we have one factor among many. And so the fact that the relationship was such that he felt comfortable sending that threat and that she was either not going to be able to do anything about it or not take her business elsewhere is some evidence that the jury could have added to the other evidence that he was controlling this organization. There were also text messages that showed that she had to run new recruits to the business by Mr. Jacobo, and he didn't have to run new recruits to the business by Ms. Handy. This was a one-way supervisory relationship. This was not a meat supplier sending meat to McDonald's. The meat supplier doesn't say to the regional manager, you need to talk to the fry cooks to make sure that we can sell more fries. The meat supplier just supplies the meat. In this instance, Mr. Jacobo was talking to Ms. Handy about the people that she had responsibility over and saying, talk to these specific people because I want to push more. And also, you need to talk to that woman, the lady next door, I forget her name. We need her on the team. Yeah, but looking at whether it's meat supplier, to use the analogy, or methamphetamine, aren't there, in the evidentiary landscape in all of these drug distribution cases, there are always communications between buyer and seller. And those communications usually always involve discussions about who's going to be delivering, where payments should be made, prices, all the things that you would, frankly, anticipate and expect in a drug distribution type conspiracy. But for a CCE case, you're looking beyond that. And I've heard you mention today, you know, setting, potentially recommending prices for what one of the downstream distributors must set. In your brief, I think you called Mr. Jacobo the idea man, but the only idea you cite is that he thought they should transport it by car, which frankly is not very revolutionary in the drug distribution world. So I guess what else besides pricing and, you know, that one idea kind of sets this case apart from just any other drug conspiracy. So the jury had more than enough evidence of not only specific things that he was exercising control over, like pricing, like where to send the money, like when to send the money, like which house to go to in Bakersfield, which person to give the money to. But also the way that he spoke with Ms. Handy and Ms. Jones and Ms. Haynes. There was a text exchange with Ms. Haynes where he said, thank you for what you're doing. I'll bless you when the time is right. That's practically papal in character, giving the jury the idea, this is a person in a position of authority and they both know it. But also in that same text exchange, he says, while you're rounding up the people who owed money so we can get the ball rolling again, also go get me Charlie's number. In other words, Charlie Rast, who was one of the runners who went between Giacobbo and  And even if Mr. Rast was primarily Mr. Johnson's employee, he could still have been counted by the jury as someone who Mr. Giacobbo, during the course of running his enterprise, supervised, managed, or organized. Mr. Rast said not only did Mr. Giacobbo buy him a car when his car broke down, and that that happened pretty immediately, but when I got to Bakersfield, Mr. Rast said, Mr. Giacobbo drove me to a motel. Not the motel that I had previously planned on staying, Mr. Giacobbo drove me to a motel. And that's consistent with what Ms. Haynes testified about what she and Mr. Martinez would do when they got to Bakersfield. So if Mr. Giacobbo is conceding that Ms. Haynes and Mr. Martinez, who primarily worked with Mr. Johnson in Oklahoma and Missouri, and not primarily with Giacobbo, if he's conceding that they are supervisees or managees or organizees, then Mr. Rast is also in that same category. And similarly, if Mr. Giacobbo is conceding that Tony Garcia, as a runner, was a managee or a supervisee, then at least one other runner, and probably several from the testimony of Samantha Handy and Adam Paquette in Bakersfield, were also supervisees. So how do you respond to the argument that these unnamed supervisees could well have been, that there wasn't sufficient evidence to show that they were distinct from the named people who were conceded to be supervisees? Well, so the only one person that Mr. Giacobbo throws out as a possible person that the jury could have concluded was doing all of the running and all of the packaging and all of the driving in Bakersfield was Tony Garcia. And just based on the scope of this operation, the jury did not have to buy that Mr. Garcia was Mr. Giacobbo's only assistant or subordinate in Bakersfield. Now, Mr. Giacobbo does at one point also throw out the name Jesus Martinez. But remember from Ms. Haynes' testimony, Mr. Martinez was based out of Oklahoma and Missouri with Mr. Johnson. Mr. Martinez was not in Bakersfield running or distributing. And Ms. Handy says runners, plural. And she gives two different physical descriptions. One of them is an overweight Hispanic man. One of them is a younger Hispanic man with a mustache. And Mr. Paquette described them as acquaintances, plural. They also both described multiple houses that they went to to get product from the people that Giacobbo would send them to. Is it possible that the jury assumed or concluded that actually Mr. Garcia was living at all those houses or he was traveling to all of those houses to be there and distribute the methamphetamine each time? They could have. But even if that weren't implausible, the jury didn't have to make that conclusion. But it is a beyond reasonable doubt standard that we're talking about here. Absolutely. And so when you say it's possible, that seems like there's daylight. No, and here's why. Because the evidence that there were more than one runner in California or there was more than one runner in California is more than just hypothetical or possible. There is sufficient evidence from which a jury could have concluded that beyond a reasonable doubt. She says runners. Samantha Handy does. Mr. Paquette says acquaintances. At least one point, he talks about going to Mr. Garcia's house on Wilson Drive, which he remembered because he used to live on that same street himself. And he also talks about going to a different house where he received methamphetamine from a youngster, someone who was 18, 19, 20 years old. Now, if that was Mr. Garcia, he probably would have just said Mr. Garcia. So you have all these data points together and you have the sheer volume of the business, which makes it deeply implausible that Mr. Jacobo just had one runner in California. And so again, where the standard is beyond a reasonable doubt, I understand, yes. But the standard is also, could a rational jury have found that beyond a reasonable doubt? And that's not even to mention the additional people that Mr. Johnson supervised who went to California or who worked, you could find for two of them on the one side of the supplier, on the other side, the subdistributor in Oklahoma. And it's not to mention the people that Ms. Handy supervised that Mr. Jacobo talked to Ms. Handy about. Counsel, can I ask you about the double jeopardy claim? My understanding from your brief, as you can see, that the conspiracy counts need to be vacated, counts two through four. But regarding the phone counts, I'm just having a hard time sort of figuring out how they stack up with the CCE, because the first element the jury was instructed to find regarding the CCE count was that Mr. Jacobo had committed one of the underlying offenses of the Controlled Substances Act, citing specifically to counts two through four, and then all the phone counts. So wouldn't the jury had necessarily had to have found, as part of that, that all the elements to the phone count were met? So there's no possible way they could have found otherwise. And if that's true, that then those elements line up with the CCE count, why doesn't Blockberger dictate that it would be double jeopardy? So you're absolutely right about all of that. And the really interesting thing about Garrett is that if you just strictly apply Blockberger, they should merge the same way conspiracy merges with CCE. And I'll confess to experiencing some surprise when I really read Garrett and all the cases that cited it, because it couldn't be more clear that the substantive offenses don't merge. And it's because Blockberger, although it's kind of a knee-jerk reaction when you're talking about double jeopardy, well, we look to Blockberger. But Garrett says, well, not so fast. Blockberger is just one way to define legislative intent. And if you look at the legislative intent, including legislative history, as they do in Garrett, it's clear that Congress wanted there to be separate penalties and separate convictions for those substantive offenses and the CCE charge. So I see I've run out of time. So the government would ask the court to affirm. Thank you, counsel. Case is submitted. Counsel are excused.